IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

NOV 21 2016

ARTHUR JOHNSTON
BY_____ DEPUTY

PATRICK DUNN and HOPE
ELLY,

    Plaintiffs,

v.

BOYD BILOXI LLC, and BOYD
GAMING CORPORATION

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

1:16cv416 LG-RHW

## COMPLAINT

### I.    INTRODUCTION

Plaintiffs, Patrick Dunn, and Hope Elly, file this Title III, ADA action,

pursuant to 42 U.S.C. § 12181, et. seq. In Count One of the Complaint,

Plaintiffs seek to enjoin the Defendants to remove architectural barriers. In

Count Two, Plaintiffs seek to enjoin Defendants to maintain practices,

policies, and procedures necessary to maintain the premises free of

architectural barriers both now and once the barriers are removed. In Count

Three, Plaintiffs seek to enjoin the Defendants' use of the premises to provide

full and equal enjoyment of the premises to the disabled. Counts Two and

Three seek independent relief in addition to the removal of architectural

barriers. In Count Four, Plaintiffs seek to enjoin Defendants' to remediate

[1]

their website that fails to show the accessible features of Imperial Palace Casino, Resort, & Spa. In Count Five, Plaintiffs seek to enjoin Defendants' use of the reservation system in a manner that screens out the disabled from being able to make reservations for most all of the higher-end hotel rooms and services.

## II.   JURISDICTION, PARTIES, AND ARTICLE III STANDING

1.  Because this is an action for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. §12181, et. seq., (hereinafter referred to as the "ADA") and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §1331 and §1343.

2.  Venue is proper in this Court, the United States District Court for the Southern District of Mississippi, pursuant to Title 28, U.S.C. §1391 and the Local Rules of the United States District Court for the Southern District of Mississippi.

3.  Plaintiff, Patrick Dunn, resides in Andalusia, Alabama. On March 8, 2001, Mr. Dunn was in an automobile accident that caused permanent damage to his C-7 vertebra in his spinal cord. As a

result, he became paralyzed, which has permanently confined him to a wheelchair and restricted his ability to use his hands, arms, and legs. Mr. Dunn is, accordingly, disabled pursuant to the Americans with Disabilities Act, in that he suffers a physical impairment substantially limiting one or more major life activities. 42 U.S.C. § 12102; *See also,* 28 C.F.R. § 36.104.

4.  Plaintiff, Hope Elly, suffers from cerebrovascular accidents, which are more commonly known as strokes. These strokes have effected both her motor and sensory functions, which causes inactivity and/or paralysis of the muscles; therefore, maintaining balance, walking, and the ability to use her hands are extremely difficult. As a result of her disability, she relies on mobility aids for locomotion. The extent of Ms. Elly's physical problems limits her ability to care for herself, perform manual tasks, walk, stand, lift, bend, grab, twist, and work, all of which are major life activities pursuant to 42 U.S.C. § 12102 (2) (A). Ms. Elly is, accordingly, disabled pursuant to the Americans with Disabilities Act, in that she suffers a physical impairment substantially limiting one or more major life activities. 42 U.S.C. § 12102; *See also,* 28 C.F.R. § 36.104.

**5.**   Defendant, Boyd Biloxi, LLC, (hereinafter "Boyd Biloxi") is a Limited Liability Company that is both registered to do business and is conducting business within the State of Mississippi sufficient to create both general and specific in personam jurisdiction. Upon information and belief from the property records on the Harrison County GIS Internet Report, Boyd Biloxi, "owns" the real property and improvements with a parcel number 1410C-01-020.000 located at 850 Bayview Avenue[1], Biloxi, Mississippi 39530. 42 U.S.C. § 12182. Upon further information and belief, Boyd Biloxi, LLC, "operates" the establishment located at 850 Bayview Avenue, Biloxi, Mississippi 39530, more commonly known as IP Casino Resort & Spa (hereinafter referred to as "IP" or "Imperial Palace"). Imperial Palace is a commercial facility in that the units are intended for nonresidential use and affect commerce. 42 U.S.C. § 12181 (2)(A). Moreover, the establishment features restaurants, a hotel, casino games, shopping, and other

---

[1] According to ipbiloxi.com the address is 850 Bayview Ave, Biloxi, Mississippi 39530; however, the Harrison County Tax Assessors office lists IP's address as 478 Caillavet Street, Biloxi, AL 39530.

entertainment which qualifies as a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

6.  Defendant, Boyd Gaming Corporation, (hereinafter "Boyd Gaming"), is a foreign corporation that is both registered to conduct business and is conducting business within the State of Mississippi sufficient to create both general and specific in personam jurisdiction. Upon information and belief, Boyd Gaming Corporation "owns" the public internet website ipbiloxi.com and "operates" the world wide websites services that are available to the public at IP Casino, Resort & Spa. 42 U.S.C. § 12182. Accordingly, Boyd Gamining Corporation's website ipbiloxi.com is a commercial facility in that its operations affect commerce. 42 U.S.C. § 12181 (2)(A). The website ipbiloxi.com is a place of public accommodation pursuant to 42 U.S.C. § 12181(7). Moreover, On July 26, 2010, the United States Department of Justice issued an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations.  75 Fed Reg. 43460.  The Department of Justice explained in the ANPRM that

although the Department has been clear that the ADA applies to websites of public accommodations, inconsistent court decisions, differing standards for determining web accessibility, and repeated calls for Department action warranted further guidance. Id. at 43464. Through the ANPRM, the Department sought to explore what regulatory provisions it could propose to make clear to entities covered by the ADA of their obligations to make their websites accessible.

7. Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it is a place of lodging offering guests rooms for stays that are short term in nature; variety of restaurants for food and drink, retail items for purchase, and other entertainment activities to the public. Accordingly, it is covered by the ADA and must comply with the Act.

8. Defendant's resort itself is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(a), which provides:

> The following private entities are considered public accommodations for purposes of this

subchapter, if the operations of such entities affect commerce:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor.

In particular, the hotel rooms are a "place of lodging", pursuant to 28 C.F.R. § 36.104, which provides:

> *Place of public accommodation* means a facility operated by a private entity whose operations affect commerce and fall within at least one of the following categories –
>
> (1) Place of lodging, except for an establishment located within a facility that contains not more than five rooms for rent or hire and that actually is occupied by the proprietor of the establishment as the residence of the proprietor. For purposes of this part, a facility is a "place of lodging" if it is –
>
> > (i) An inn, hotel, or motel; or
> >
> > (ii) A facility that –
> >
> > > (A) Provides guest rooms for sleeping for stays that primarily are short-term in nature (generally 30 days or

[7]

less) where the occupant does not have the right to return to a specific room or unit after the conclusion of his or her stay; and

(B) Provides guest rooms under conditions and with amenities similar to a hotel, motel, or inn, including the following –

(1) On- or off-site management and reservations service;

(2) Rooms available on a walk-up or call-in basis;

(3) Availability of housekeeping or linen service; and

(4) Acceptance of reservations for a guest room type without guaranteeing a particular unit or room until check-in, and without a prior lease or security deposit.

9. Plaintiffs stay at the resort establishes their conformity to the elements of 28 C.F.R. § 36.104, because the resort was rented to them for a short-term stay, (less than 30 days); Upon Plaintiffs' arrival at IP Casino Resort & Spa, they were required to check in at the front desk with an employee of IP; Plaintiffs had the opportunity to have housekeeping services during their stay;

Plaintiffs did not have the right to return to their specific room after they checked-out of their hotel room at the front desk; the services provided were similar to other hotels or motels in that there was onsite employees and a reservation system, as well as reservations accepted without guaranteeing a particular room until check –in and without a prior lease; and housekeeping or linen service was available.

10. All events giving rise to this lawsuit occurred in the Southern District of Mississippi and the Defendants are citizens thereof.

11. Plaintiff Patrick Dunn enjoys vacationing in Biloxi, Mississippi because he enjoys the different type of entertainment Biloxi offers as well as the nightlife. Mr. Dunn enjoys the outgoing social lifestyle, whether it is playing casino games or enjoying the night life at the resorts that offer all sorts of social activities and entertainment. More specifically, Mr. Dunn enjoys IP Casino Resort & Spa, which is the subject of this action. Mr. Dunn specifically and definitely intends to continue to go to IP when he travels to Biloxi because he loves the showers at IP. Mr. Dunn does not know exactly when he will go back to IP, because he has not

planned out every trip nor every meal for the rest of his life. Such specific planning is not necessary to invoke the ADA. See, *e.g. Parr v. L & L Drive Inn Restaurant* 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and *Segal v. Rickey's Restaurant and Lounge, Inc.* No. 11-61766-cn, (S.D. Fla 2012) ("*Specification as to date and time of return to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment*".). Mr. Dunn definitely intends to return to IP Casino Resort & Spa, however, not only to enjoy the nightlife, sleep, play casino games, drink, eat, and enjoy the entertainment and other activities but also to see if IP will do the repairs to become ADA compliant and will continue to do so in the future to ensure Defendants maintain its resort to accessibility standards. Mr. Dunn will continue to return even after the repairs are made because IP Resort Casino & Spa is an award winning affordable place to vacation that offers a wide variety of goods, services and entertainment.

12. Mr. Dunn planned a vacation at IP Resort Casino & Spa in the summer of 2016. On or around September 2016, Mr. Dunn went online to ipbiloxi.com to determine if the IP Resort would meet his

accessibility needs but was unable to do so, which is a failure by IP to properly maintain its website and reservation system in accordance with the ADA. As a result of Defendant's failure, Mr. Dunn was unable to determine any of the accessible features of the Hotel & Casino itself because Defendants do not identify and describe the accessible features whatsoever, nor was Mr. Dunn afforded the opportunity to make reservations online because Mr. Dunn was not able to determine any suites that are accessible whereas other individuals without disabilities are able to reserve non-accessible suites. Due to the lack of accessibility on defendant's website and reservation system Mr. Dunn called the hotel and made reservations through an employee working the reservation line. During the phone call Mr. Dunn was informed that there are no accessible suites at IP Casino. For that reason, Mr. Dunn requested an accessible room with an adjoining non-accessible room for his attending aid. The employee for IP stated to Mr. Dunn that there were no connecting rooms and the best they could do was request that the rooms controller try to make Mr. Dunn's assistant's room be on the same floor as his room. Mr.

Dunn, after some frustration of feeling inferior, decided that despite the inequality, difficulty and inconvenience this would cause him, he would make do and made the reservations. When Mr. Dunn arrived at IP, there was no accessible parking close to the check in area and he had to travel longer distances from the parking to the front entrance of IP compared to non-disabled individuals. Mr. Dunn finally got to the check in counter, and was both shocked and pleased that Defendants had at least attempted to provide an accessible check in counter, although the counter did not provide the required counter space. Moreover, he waited between 2 and 3 hours at the accessible counter, because it was not properly maintained with staff and readily available for Mr. Dunn to transact business. Mr. Dunn, out of his prior experiences at other resorts, communicated with the front desk worker of IP[2] to inquire yet again, if there was an accessible room with an adjoining non-accessible room. To no avail, the front desk employee

---

[2] Mr. Dunn's experience when communicating with the employee at the check in counter was not in the same manner as other individuals without disabilities. Defendants clutter décor and computer monitors on the purported accessible counter so that Mr. Dunn felt as if he was talking to décor and the computer monitor rather than visually interacting with the employee who he was speaking to behind the desk.

[12]

informed him that they do not provide accessible rooms with adjoining non-accessible rooms, and that the only adjoining rooms with connecting doorways are located on the lower floors but not on the floor they had reserved him. During Mr. Dunn's visit he went from the parking lot to the entranceways, from the parking lot to and throughout the hotel, including her rented hotel room, the services areas, bathrooms, pool area, casinos, the buffet, Chill Lounge, Infusion, the Spa, paths of travel, common areas, recreational areas, and the fitness center. Mr. Dunn, accordingly, has standing as to all the areas he visited. During this vacation, he encountered barriers in the areas described above as well as barriers described more specifically throughout the Complaint. Mr. Dunn absolutely wants to return to IP Casino Resort & Spa and Mr. Dunn will definitely do so in the future, in particular to see if repairs are being made to achieve and maintain compliance, even after initial repairs are made.

13. Plaintiff Hope Elly vacations in Biloxi, Mississippi because she enjoys the relaxing beach environment as well as the entertainment Biloxi offers. Ms. Elly enjoys the laid-back beach environment and

[13]

resorts that offer all sorts of activities and entertainment. More specifically, Ms. Elly enjoys IP Casino Resort & Spa, which is the subject of this action. Ms. Elly specifically and definitely intends to continue to go to IP when she travels to Biloxi. Ms. Elly does not know exactly when she will go back to IP, because she has not planned out every trip nor every meal for the rest of her life. Such specific planning is not necessary to invoke the ADA. See, *e.g. Parr v. L & L Drive Inn Restaurant* 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and *Segal v. Rickey's Restaurant and Lounge, Inc*. No. 11-61766-cn, (S.D. Fla 2012) ("*Specification as to date and time of return to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment*".). Ms. Elly definitely intends to return to IP Casino Resort & Spa, however, not only to sleep, play casino games, drink, eat, and enjoy the entertainment and other activities but also to see if IP will do the repairs to become ADA compliant. Ms. Elly will continue to return even after the repairs are made because IP Resort Casino & Spa is an affordable and convenient place to vacation that offers a wide variety of goods and services and entertainment.

**14.** Ms. Elly and her best friend planned a vacation at IP Resort Casino & Spa in June, 2016. On or around June 2016, Ms. Elly went online to determine if IP Resort would meet her accessibility needs but was unable to do so as a result of IP's failure to properly identify and describe the accessible features of the hotel rooms on the website. As a result of the discriminatory acts by Defendant, Ms. Elly further searched through the IP Casino Resort & Spa website to determine if the hotel had any accessible features at all, or at the very least, assess whether the IP Resort would be large enough for her to make do since IP Resort failed to identify any of its accessible features. Her review of the IP Resort website was inconclusive because the website lacked sufficient information. Ultimately, Ms. Elly decided to go to the IP Resort Casino & Spa, made reservations, and went there with her best friend. During Ms. Elly's visit she went from the parking lot to the entranceways, from the parking lot to and throughout the hotel, including her rented hotel room, the services areas, bathrooms, pool area, casinos, Back Bay Buffet, paths of travel, common areas, recreational areas, and the fitness center. Ms. Elly accordingly, has standing as to all the

[15]

areas she visited. During this vacation, she encountered barriers in the areas described above as well as barriers described more specifically throughout the Complaint. Ms. Elly wants to return to IP Casino Resort & Spa and Ms. Elly will definitely do so in the future, in particular to see if repairs are being made to achieve and maintain compliance, even after initial repairs are made.

15. Because of the barriers described below in paragraph 28, and throughout the Complaint, Plaintiffs have been denied full and equal enjoyment of the Defendants' premises on the basis of their disabilities.

16. Plaintiffs accordingly, have standing to pursue this case because (1) they are disabled, pursuant to the statutory and regulatory definition; (2) the Defendants' hotel, casino and other entertainment complex is a place of public accommodation, pursuant to the statutory and regulatory definition; and (3) they have been denied full and equal enjoyment of the Defendants' premises on the basis of their disabilities. As described more fully in paragraph 26, there exists a genuine threat of imminent future injury.

### III.   PLAINTIFFS' CLAIMS

**ADA, Title III**

17. On or about July 26, 1990, Congress enacted Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181 et.seq. Commercial enterprises were provided one and a half years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. (42 U.S.C. §12181; 20 C.F.R. §36.508 (A); *See also*, § 36.304).

18. Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it provides transient lodging, as described above and defined by regulation; and it further offers a variety of restaurants for food and drink, retail items for purchase, and other entertainment activities to the public. Accordingly, it is covered by the ADA and must comply with the Act.

# COUNT ONE
# VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(iv) and (v)
### (Architectural Barriers)

### Defendants' Existing Facilities Are Subject to the 2010 ADA Design Standards

19. Plaintiffs are informed and believe based on publicly available information that the original IP Casino Resort & Spa, then known as "Imperial Palace Hotel & Casino", was first constructed in 1997, and then re-constructed and/or altered in 2005 after Hurricane Katrina. The reconstruction and/or alterations included but are not limited to reconstructing the pavilion, the player's club, the hotel VIP registration, retail, valet, baggage, and back-of-house offices based on a new design; remodeling all three levels of the casinos with new finishes installed, remodeling the spa, three floors of suites, and restaurants; and adding to the property a state-of-the-art circle bar, a sports bar, a casual restaurant, and a steak house.

20. Additionally, Plaintiffs are informed and believe that in 2010, IP Casino Resort Spa completed renovations estimated at $1.4 million. Plaintiffs are further informed and believe based on publicly available information, that once Boyd Gaming Company

announced its purchase of IP Casino Resort & Spa in 2011, it committed another $44 million in infrastructure improvements to the property. Plaintiffs are further informed and believe that in 2014 IP Casino Resort & Spa spent between $7.5-8 million to refurbish more than 350 of its hotel guest rooms, and then spent $2.5 million more in 2015 to upgrade 54 of its hotel suites. Plaintiffs are informed and believe based on publicly available information that sometime after Boyd Gaming Corporation acquired IP in 2011, IP Casino Resort & Spa underwent a five phase expansion project. The expansion included but is not limited to designing and constructing a non-smoking slot machine gaming area, expansion to the existing central plant, renovation to the entrance of the existing Back Bay Buffet, designing and constructing a 26,000 square foot casino gaming area, and designing and constructing a 5,000 square foot Asian-themed restaurant which displays an entry fog screen, projection mood wall, Shabu tables, and Teppanyaki tables overlooking the Biloxi Bay. Further, chiller plant equipment was installed which includes a new generator, chiller, cooling tower, and raised steel floor structure to accommodate the new live

loads.

21. The ADA was enacted requiring that facilities constructed prior to January 26, 1992, are considered an "existing" "facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All "alterations" made to existing facilities after January 26, 1992, and all "new construction" after January 26, 1993, must be *readily accessible to and usable by individuals with disabilities*, including *individuals who use wheelchairs*. 42 U.S.C. § 12183(a) and (b). 28 *C.F.R.* § 36.402. "Readily accessible to and usable by. . ." is the "new construction" standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28 *C.F.R.* § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the "new construction" standards is if the design and construction of the building to be readily accessible and usable is "structurally impracticable". 42 U.S.C. § 12183(a)(1). The "structural impracticability" defense applies only in rare circumstances of extraordinary terrain. 28 *C.F.R.* § 36.401(c). "Readily accessible to

[20]

and usable by. . ." is also the "alterations" standard. 42 U.S.C. § 12183(a)(2). "Alterations" must be made to the maximum extent feasible. 42 U.S.C. § 12183(a)(2); 28 C.F.R. § 36.402. An alteration is a change to a place of public accommodation or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 C.F.R. § 36.402(b).

22. New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design. 28 C.F.R. § 36.406 establishes whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply: New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 C.F.R. § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards

if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010, and before March 15, 2012. 28 *C.F.R.* § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. *Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable.* See 28 C.F.R. § 36.406(5)(ii) which states, "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards." Moreover, please note that 28 C.F.R. §

[22]

36.304(d), Appendix provides: "Elements that do not comply with the requirements for those elements in the 1991 Standards or that do not comply with the supplemental requirements (i.e., elements for which there are neither technical nor scoping specifications in the 1991 Standards), must be modified to the extent readily achievable" in accordance with the 2010 Standards.

23. For the architectural barriers at issue in this case, the 2010 Standards for Accessible Design are applicable.

**Plaintiffs' Particularized Standing to Pursue an Injunction**

24. The Defendants have discriminated, and continue to discriminate, against Plaintiffs, and others who are similarly situated, by denying full and equal access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations at IP in derogation of 42 U.S.C. § 12101 et. seq., and as prohibited by 42 U.S.C. § 12182 et-seq., and by failing to remove architectural barriers pursuant to 42 U.S.C. § 12182(b)(2)(A)(iv), where such removal is readily achievable, or, even if the removal is not readily achievable, by failing to use alternative methods that are readily achievable, 42 U.S.C. § 12182 (b)(2)(A)(v).

25. As described above, prior to the filing of this lawsuit, Plaintiffs were denied full and equal access to all of the benefits, accommodations and services offered to individuals without disabilities within and about the Defendants' facility. Plaintiffs' access was inhibited by each of the described architectural barriers detailed in this Complaint which remain at the facility in violation of the ADA. Because of the foregoing, Plaintiffs have suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against.

26. Plaintiffs have definite plans to return to IP in the future, as described in paragraphs 11-14. Plaintiffs will return to IP within the next months not only to shop, eat, drink, and enjoy other entertainment, but also to see if IP has repaired the barriers, and changed its practices and procedures. Plaintiffs will continue to do so, even when IP is repaired, Plaintiffs will continue to stay, shop, eat, drink, and vacation there, as they have in past visits to Biloxi. To the Plaintiffs, IP is a great place to relax, shop, eat, drink, and enjoy other entertainment. Absent remedial action by Defendants, Plaintiffs will continue to encounter the architectural barriers, and

[24]

the discriminatory policies, practices, and procedures described herein and as a result, be discriminated against by Defendants on the basis of their disabilities. As persuasive authority and also as a matter of common sense, the Eleventh Circuit, held in *Houston v. Marod Supermarkets*, that when architectural barriers have not been remedied "*there is a 100% likelihood that plaintiff… will suffer the alleged injury again when he returns to the store.*" Due to the definiteness of Plaintiffs' future plans to continue visiting the subject facility, there exists a genuine threat of imminent future injury.

## Architectural Barriers

27. Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 28 C.F.R. Part 36.

28. Plaintiffs have been throughout all the parking lot at IP and from the parking lot to the entrances, to and throughout the retail areas, the retail areas themselves, from the entrances to and throughout the restrooms, the restrooms themselves; from the entrances to and throughout the dining areas, the dining areas themselves, the

[25]

common areas including the hotel lobby, casinos, arcade, and fitness and spa area, the pool area, the sales and service counters, throughout circulation paths and accessible routes, from the parking lot to and throughout the common areas including the retail and service areas, paths of travel, and in particular but not limited to all of which is more specifically described below. Moreover, Defendants' facility located at 850 Bayview Avenue, Biloxi, Mississippi 39530, more commonly known as "IP Casino Resort & Spa", violates the ADA in the hotel guest rooms, pool area, parking lot, the entranceways, from the parking lot to and throughout the common areas and the retail service areas, bathrooms, paths of travel, common areas, and in particular but not limited to:

## PARKING AREAS

    a.    IP parking spaces in the parking lot for able-bodied individuals, but fails to provide any ADA accessible parking spaces for non-able-bodied individuals, including but not limited to the following elements:

        i. There are no access aisles that connect to an

accessible route to the entrance of the Resort;

ii. The purported accessible parking spaces fail to be wide enough;

iii. The purported accessible parking spaces adjacent access aisles fail to meet the required width to be usable by individuals with disabilities;

iv. IP fails to have and otherwise fails to evenly disburse the van accessible parking spaces throughout the parking areas;

v. The parking spaces are not located at the shortest accessible route to the entrance;

vi. There is no designated ADA "van accessible" parking space and its adjacent access aisle serving this parking area;

vii. The parking spaces and its adjacent access aisles fail to be properly marked so as to be discouraged from parking in them;

viii. IP fails to maintain its parking spaces so that they are readily accessible to and usable by individuals with

[27]

disabilities;

    ix. There is no ADA van accessible signage identifying any parking spaces as "van" accessible;

    x. There is no signage displaying the international symbol of accessibility at any of the parking spaces;

**b.** IP parking spaces in the parking garage for able-bodied individuals, but fails to provide any ADA accessible parking spaces for non-able-bodied individuals, including but not limited to the following:

    i. There are no access aisles that connect to an accessible route to the entrance of the Resort;

    ii. The purported accessible parking spaces fail to be wide enough;

    iii. The purported accessible parking spaces adjacent access aisles fail to meet the required width to be usable by individuals with disabilities;

    iv. IP fails to have and otherwise fails to evenly disburse the van accessible parking spaces throughout the parking areas;

v. The parking spaces are not located at the shortest accessible route to the entrance;

vi. There is no designated ADA "van accessible" parking space and its adjacent access aisle serving this parking area;

vii. The parking spaces and its adjacent access aisles fail to be properly marked so as to be discouraged from parking in them;

viii. IP fails to maintain its parking spaces so that they are readily accessible to and usable by individuals with disabilities;

ix. There is no ADA van accessible signage identifying any parking spaces as "van" accessible;

x. There is no signage displaying the international symbol of accessibility at any of the parking spaces;

## "ESSENTIALS" GIFT SHOP

c. IP provides an accessible route to and throughout the shopping retail aisles in the gift shop for able-bodied individuals but fails to provide an ADA accessible route to and throughout the

retail shopping aisle in the gift shop for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at the IP "Essentials" Gift Shop, including but not limited to the following elements:

i. Throughout the accessible route there is merchandise that is for sale to the public that obstructs the required 36 inches of clear floor space on the accessible route which prohibits individuals with disabilities to have the same shopping experience as individuals without disabilities;

ii. The current practice at the IP Essentials gift shop is to maintain the merchandise display tables and racks within the required clear floor or ground space of the accessible route which prohibits individuals with disabilities from the full and equal enjoyment of the goods and services at the IP Essentials gift shop;

iii. IP Essentials gift shop fails to have or otherwise fails to enforce its policies, practices, or procedures on

maintaining in operable working condition the features of the purported accessible route to and throughout the retail store shopping aisles so that the goods and services are readily accessible to and usable by individuals with disabilities;

iv. IP Essentials gift shop has ineffective policies, practices, or procedures that ensures the accessible route is readily accessible to and usable by individuals with disabilities so that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals without disabilities;

d. IP Essentials gift shop provides shelves displaying merchandise that is for sale to the public to able-bodied individuals, but fails to provide non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that afforded to other individuals by failing to provided ADA accessible display shelves displaying merchandise that is for sale;

[31]

e.  IP Essentials gift shop provides a sales/service counter for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements:

   i. There is no ADA accessible portion of the sales/service counter that extends the same depth as the non-accessible portion of the sales/service counter;

   ii. The sales/service counter exceeds the maximum allowed height of 36 inches above the finished floor;

   iii. There is no counter surface that extends 36 inches long which prohibits individuals with disabilities from being afforded the opportunity to transact business with the same level of convenience as individuals without disabilities;

iv. There is no ADA accessible sales/service counter provided 28 inches minimum and 34 inches maximum above the finished floor that allows for the required knee and toe clearance;

v. IP Essentials gift shop provides a point of sale machine to transact business at the sales/service counter for able-bodied individuals, but fails to provide the same level of service to non-able-bodied individuals by providing a point of sale machine at an accessible portion of the counter;

vi. The current practice at IP Essentials gift shop is to maintain merchandise within the required clear counter surface which prohibits individuals with disabilities from the full and equal enjoyment of the goods and services at IP Essentials gift shop;

vii. IP Essentials gift shop fails to maintain the accessible features at the sales/service counter that are required to be readily accessible to and usable by individuals with disabilities;

[33]

    **viii.** IP Essentials gift shop fails to maintain the accessible features of the gift shop that are required to be readily accessible to and usable by individuals with disabilities;

## FAMILY RESTROOMS IN SPA/FITNESS CENTER

**f.** IP provides a family restroom in the spa/fitness center for able-bodied individuals, but fails to provide an ADA accessible family restroom for non-able-bodied individuals, including but not limited to the following elements:

    **i.** The locking mechanism on the restroom door requires tight grasping, pinching, or twisting of the wrist;

    **ii.** The centerline of the water closet exceeds the maximum allowed 18 inches;

    **iii.** The side wall grab bar fails to extend a minimum of 54 inches from the rear wall;

**g.** IP provides a lavatory in the family restroom in the spa/fitness center for able-bodied individuals, but fails to provide an ADA accessible lavatory in the family restroom for non-able-bodied

[34]

individuals, including but not limited to the following elements:

    i. The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

    ii. The soap dispenser exceeds the maximum allowed obstructed reach range of 44 inches;

    iii. The operable part on the trash can requires individuals to use their foot to open the trash can, therefore, the trash can fails to meet the requirement that operable parts must be operable with one hand;

## FIRST FLOOR CASINO WOMEN'S RESTROOM

**h.** IP provides a toilet compartment to the left of the entrance in the first floor casino for able-bodied individuals, but fails to provide an ADA accessible toilet compartment for non-able-bodied individuals, including but not limited to the following elements:

    i. The toilet compartment door fails to be self-closing;

    ii. There are not door pulls located on both sides of the toilet compartment door;

[35]

iii. The toilet paper dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

iv. The centerline of the water closet exceeds the maximum allowed 18 inches;

v. The water closet seat exceeds the maximum allowed height of 19 inches above the finished floor;

vi. The toilet seat cover dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

vii. The coat hook exceeds the maximum allowed height of 48 inches above the finished floor;

viii. The side wall grab bar exceeds the maximum allowed 12 inches from the rear wall;

ix. The toilet compartment fails to meet the required width of 60 inches;

i. IP provides a toilet compartment to the right of the entrance in the first floor casino for able-bodied individuals, but fails to provide an ADA accessible toilet compartment for non-able-bodied individuals, including but not limited to the following elements:

      i. There are not door pulls located on both sides of the toilet compartment door;

     ii. The coat hook exceeds the maximum allowed height of 48 inches above the finished floor;

   iii. The toilet compartment fails to meet the required width of 60 inches;

   iv. The water closet seat exceeds the maximum allowed height of 19 inches above the finished floor;

    v. The toilet seat cover dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

j.    IP provides a lavatory in the first floor casino for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals, including but not limited to the following elements:

      i. The faucet at the lavatory sink fails to remain on for the required 10 seconds;

     ii. The bottom reflecting surface of the mirror exceeds the maximum allowed 40 inches above the finished floor;

[37]

## SECOND FLOOR CASINO WOMEN'S RESTROOM

**k.**   IP provides a toilet compartment in the second floor casino for able-bodied individuals, but fails to provide an ADA accessible toilet compartment for non-able-bodied individuals, including but not limited to the following elements:

   **i.** The toilet compartment door fails to be self-closing;

   **ii.** There are not door pulls located on both sides of the toilet compartment door;

   **iii.** The highest operable part of the baby changing table exceeds the maximum allowed height of 48 inches above the finished floor;

   **iv.** The coat hook exceeds the maximum allowed height of 48 inches above the finished floor;

   **v.** The side wall grab bar fails to extend 12 inches from the rear wall;

   **vi.** The side wall grab bar fails to extend the minimum required 54 inches;

   **vii.** The toilet seat cover dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

[38]

        viii. The toilet paper dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

        ix. The toilet compartment fails to meet the required width of 60 inches;

l.    IP provides a lavatory in the second floor casino for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals, including but not limited to the following elements:

        i. The floor mat at the lavatory is not stable, firm, or otherwise secure to the floor;

        ii. The faucet at the lavatory sink fails to remain on for the required 10 seconds;

m.   IP fails to provide an entrance into the women's restroom in the second floor casino that provides the required width of 32 inches;

## WOMEN'S RESTROOM IN POOL AREA

n.   IP provides a toilet compartment in the pool area for able-bodied individuals, but fails to provide an ADA accessible

toilet compartment for non-able-bodied individuals, including but not limited to the following elements:

    **i.** The toilet compartment door fails to be self-closing;

    **ii.** There are not door pulls located on both sides of the toilet compartment door;

    **iii.** The toilet compartment fails to meet the required width of 60 inches;

    **iv.** The coat hook exceeds the maximum allowed height of 48 inches above the finished floor;

    **v.** The toilet paper dispenser fails to be located 7 inches minimum and 9 inches maximum in front of the water closet;

**o.** IP fails to provide 48x24 inches of maneuvering clearance at the restroom door that is required for a disabled individual to be able to exit the restroom;

## WOMEN'S RESTROOM BY CHECK-IN AREA

**p.** IP provides a toilet compartment in the women's restroom by the check-in area for able-bodied individuals, but fails to provide an ADA accessible toilet compartment for non-able-

[40]

bodied individuals, including but not limited to the following elements:

    **i.** The toilet compartment door fails to be self-closing;

    **ii.** There are not door pulls located on both sides of the toilet compartment door;

    **iii.** The toilet compartment fails to meet the required width of 60 inches;

    **iv.** The coat hook exceeds the maximum allowed height of 48 inches above the finished floor;

**q.** IP provides a lavatory in the women's restroom by the check-in area for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals, including but not limited to the following elements:

    **i.** The floor mat at the lavatory fails to be stable, firm, or otherwise secure to the ground;

    **ii.** The bottom reflecting surface of the mirrors behind the lavatory sinks to the right upon entering the restroom exceed the maximum allowed height of 40 inches above the finished floor;

r.   The highest operable part of the baby changing table exceeds the maximum allowed height of 48 inches above the finished floor;

s.   The door handle on the restroom door exceeds the maximum allowed 48 inches above the finished floor;

**WOMEN'S RESTROOM BY ELEVATORS TO PARKING DECK**

t.   IP provides a toilet compartment in the women's restroom by the elevators to the parking deck for able-bodied individuals, but fails to provide an ADA accessible toilet compartment for non-able-bodied individuals, including but not limited to the following elements:

   i. The toilet compartment fails to meet the required width of 60 inches;

   ii. The toilet compartment door fails to be self-closing;

   iii. There are not door pulls located on both sides of the toilet compartment door;

   iv. The coat hook exceeds the maximum allowed height of 48 inches above the finished floor;

v. The water closet seat exceeds the maximum allowed height of 19 inches above the finished floor;

vi. The toilet paper dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

vii. The toilet seat cover dispenser exceeds the maximum allowed height of 48 inches above the finished floor;

u. IP provides a lavatory in the women's restroom by the elevators to the parking deck for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals, including but not limited to the following elements:

i. The faucet at the lavatory sink fails to remain on for the required 10 seconds;

ii. The bottom reflecting surface of the mirrors at the lavatory sink exceeds the maximum allowed height of 40 inches above the finished floor;

**CASINO AREA**

v. Imperial Palace provides casino games for able bodied individuals but fails to provide that same experience by providing

[43]

ADA accessible arcade games to non-able bodied individuals, including but not limited to the following elements:

    i. The casino games do not provide the required clear floor or ground space for an individual with a disability to approach the game;

w. Imperial Palace provides cashier counters for able-bodied individuals but fails to afford non-able-bodied individuals the same experience by not providing an ADA accessible counter including but not limited to the following elements:

    i. The service counters exceed the maximum allowed height of 36 inches above the finished floor;

    ii. There is no ADA accessible counter provided that is arranged for a forward or side approach;

    iii. There is no ADA accessible service counter that extends the same depth as the non-accessible portion of the non-accessible counter;

    iv. There is no ADA accessible counter that has a clear counter surface that is 36 inches wide;

[44]

v. Imperial Palace fails to maintain the accessible features of the counter that are required to be readily accessible to and usable by individuals with disabilities;

## INFUSION

x. Imperial Palace provides a snack bar counter for able-bodied individuals to place food and drink orders but fails to afford non-able-bodied individuals the same experience by not providing an ADA accessible counter including but not limited to the following elements:

i. The counter exceeds the maximum allowed height of 36 inches above the finished floor;

ii. There is no ADA accessible counter provided that is arranged for a forward or side approach;

iii. There is no ADA accessible service counter that extends the same depth as the non-accessible portion of the non-accessible counter;

  iv. There is no ADA accessible counter that has a clear counter surface that is 36 inches wide;

  v. Imperial Palace fails to maintain the accessible features of the counter that are required to be readily accessible to and usable by individuals with disabilities;

y.  Imperial Palace provides a snack bar counter for able-bodied individuals to pick up their food orders but fails to afford non-able-bodied individuals the same experience by not providing an ADA accessible counter including but not limited to the following elements:

  i. The counter exceeds the maximum allowed height of 36 inches above the finished floor;

  ii. There is no ADA accessible counter provided that is arranged for a forward or side approach;

  iii. There is no ADA accessible service counter that extends the same depth as the non-accessible portion of the non-accessible counter;

[46]

    iv. There is no ADA accessible counter that has a clear counter surface that is 36 inches wide;

    v. Imperial Palace fails to maintain the accessible features of the counter that are required to be readily accessible to and usable by individuals with disabilities;

z. Imperial Palace provides seating tables for able-bodied individuals, but fails to afford seating tables for non-able-bodied individuals;

    i. There is no ADA accessible high-top bar table provided 28 inches minimum and 34 inches maximum above the finished floor that allows for the proper toe clearance;

    ii. Imperial Palace fails to maintain the accessible features at the high-top bar tables;

    iii. The high-top bar table area fails to provide at least 5% ADA accessible seating;

aa.   The current practice at Imperial Palace is to locate large trash bins within the required clear floor space of the condiments and napkins dispensers;

bb.   The current practice at Imperial Palace is to locate condiments, napkins dispensers, and other self-serving goods on non-accessible counters which prohibits individuals with disabilities from being afforded the opportunity to use the goods and services provided at Infusion;

## ARCADE AREA

cc.   Imperial Palace provides arcade game for able bodied individuals but fails to provide that same experience by providing ADA accessible arcade games to non-able bodied individuals, including but not limited to the following elements:

   i. The arcade games do not provide the required clear floor or ground space for an individual with a disability to approach the game;

[48]

## CHILL LOUNGE

**dd.** Imperial Palace provides lounge seating chairs for able-bodied individuals to sit and relax while socializing, but fails to afford non-able-bodied individuals the same opportunity to participate in, or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit;

**ee.** Imperial Palace provides tables for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to the experience afforded to individuals without disabilities, including but not limited to the following elements:

    **i.** There is no seating tables that measure the required 28-34 inches above the finished floor;

    **ii.** Chill Lounge fails to provide at least 5% ADA accessible seating tables;

[49]

iii. The seating tables fail to provide the required clear floor space for a forward approach;

iv. The seating tables fails to provide the required knee clearance, which prevents an individual with a disability from being able to approach the seating tables;

v. The seating tables fails to provide the required toe clearance, which prevents an individual with a disability from being able to approach the seating tables;

ff.   Imperial Palace provides a bar area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements:

i. Imperial Palace does not provide any ADA accessible seating at the bar;

ii. The top surface of the restaurant bar exceeds the maximum allowed height of 34 inches above the finished floor;

iii. The bar area fails to provide five percent (5%) ADA seating;

iv. The bar counter fails to provide the required knee and toe clearance for an individual with a disability to be afforded the opportunity to sit at the bar;

v. Imperial Palace provides two types of seating tables for able-bodied individuals in the bar area (bar seating and lounge seating), but fail to provide that same level of service to individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit of Imperial Palace;

vi. Imperial Palace fails to maintain the accessible features at the bar service counter;

## FITNESS CENTER

gg. Imperial Palace provides a fitness center for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that shopping experience afforded to other individuals without disabilities, including but not limited to the following elements:

   i. Imperial Palace fails to provide at least one type of each exercise machine with the clear floor or ground surface for a wheelchair user to be able to approach the equipment;

   ii. Imperial Palace fails to maintain an adjacent accessible route to the exercise machines clear floor space which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the fitness room;

   iii. Imperial Palace fails to maintain the accessible features within the fitness center that are required to

[52]

be readily accessible to and usable by individuals with disabilities;

## SPA COUNTER

hh. Imperial Palace provides sales/service counters at the Spa for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to the experience afforded to individuals without disabilities, including but not limited to the following elements:

    i. The sales/service counters exceed the maximum allowed height of 36 inches above the finished floor;

    ii. The sales service counters fail to extend the same depth as the non-accessible portion of the sales/service counters;

    iii. There is no sales/service counter provided with the clear floor space allowing an individual with a disability to approach the sales/service counter;

[53]

iv. Imperial Palace provides a point of sale machine to transact business at the sales/service counter to the left side of the store for able-bodied individuals, but fails to provide the same level of service to non-able-bodied individuals by providing a point of sale machine at an accessible portion of the counter;

v. There is no ADA accessible counter provided 28 inches minimum and 34 inches' maximum above the finished floor;

vi. Imperial Palace fails to maintain the accessible features of the sales/service counters that are required to be readily accessible to and usable by individuals with disabilities;

## VALET AREA

ii. The facility provides a valet counter for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that shopping experience afforded to other individuals

[54]

without disabilities, including but not limited to the following elements:

    **i.** There is no ADA accessible portion of the sales/service counter that extends the same depth as the non-accessible portion of the sales/service counter;

    **ii.** There is no 36-inch-wide clear counter surface provided at the counter for individuals with disabilities to be afforded the opportunity to transact business at the valet counter.

    **iii.** The valet counter exceeds the maximum allowed height of 36 inches above the finished floor;

    **iv.** The facility provides a valet counter for able-bodied individuals but fails to afford non-able-bodied individuals the full and equal enjoyment to participate in or benefit from, the goods, services, facilities, privileges, advantages, or accommodations that is a comparable experience to that of able bodied individuals;

[55]

jj.   Imperial Palace provides lounge seating chairs in the valet waiting area for able-bodied individuals to sit and relax while waiting for their vehicle, but fails to afford non-able-bodied individuals the same opportunity to participate in, or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit;

## POOL AREA

kk.   Imperial Palace provides a swimming pool for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in, or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit;

i. Imperial Palace fails to provide at least two accessible means of entry for an individual with a disability to be afforded the opportunity to get into the pool;

[56]

    **ii.** The pool fails to provide a lift which prevents a wheelchair dependent individuals from accessing the pool;

    **iii.** The facility fails to provide 30x48 inches of required clear floor or ground space for a disabled individual to approach the accessible seating by the pool;

**ll.** Imperial Palace fails to provide an accessible route to the cabana seating area around the pool;

**mm.** Imperial Palace provides a Hot Tub for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in, or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit, including but not limited to the following elements:

    **i.** Imperial Palace fails to provide at least one accessible means of entry for an individual with a disability to be afforded the opportunity to get into the pool;

[57]

ii. The hot tub fails to provide a lift or other mean of entry which prevents a wheelchair dependent individuals from accessing the pool;

iii. There is no accessible route leading up to the hot tub which denies individuals with disabilities the opportunity to experience the outdoor spa;

iv. The facility fails to provide 30x48 inches of required clear floor or ground space for a disabled individual to approach the accessible seating by the pool;

## MEN'S RESTROOM NEAR CHECK-IN COUNTER

nn. Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment furthest from the restroom entrance:

i. The toilet compartment door fails to have door pulls located on both sides;

[58]

ii. The toilet compartment door fails to be self-closing;

iii. The centerline of the water closet exceeds the maximum allowed distance of 18 inches;

iv. The toilet compartment is measured 59 inches wide which fails to meet the required width of 60 inches which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the compartment;

v. IP fails to maintain the accessible features within the toilet compartment that are required to be readily accessible to and usable by individuals with disabilities;

oo. Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements

[59]

in the toilet compartment adjacent to the furthest compartment from the restroom entrance:

**i.** The toilet compartment door fails to have door pulls located on both sides;

**ii.** The toilet compartment door fails to be self-closing;

**iii.** The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

**iv.** The rear wall grab bar fails to be properly located properly on the rear wall;

**v.** The toilet compartment door swings into the required maneuvering clearance around the water closet which prevents an individual who uses a mobility device from being afforded the opportunity to enter the compartment;

**vi.** The toilet compartment door fails to be located a maximum of 4 inches from the side wall or the partition furthest from the water closet;

**pp.** Imperial Palace provides a lavatory for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals which includes but is not limited to the following elements:

    **i.** The trashcan is located in the required clear floor space around the lavatory;

    **ii.** The trashcan obstructs the required knee and toe clearance underneath the lavatory;

    **iii.** The current practice at IP is to locate the trashcan in the required clear floor space at the lavatory;

    **iv.** The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

    **v.** The paper towel dispenser is measured at 50 inches, which fails to meet the required obstructed reach range of 44 inches;

**qq.** Imperial Palace provides urinals for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service,

facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment furthest from the restroom entrance:

    i. The rim of the urinal exceeds the maximum required height of 17 inches above the finished floor;

    ii. Imperial Palace provides a urinal for able bodied individuals, but fails to provide at least 1 ADA accessible urinal with the required 36 inches of clear floor or ground space;

    iii. The urinal is confined on all or part of three sides and therefore the width fails to meet the required 36 inches;

rr. When exiting the first door out of the restroom there is not 18 inches of latch side clearance on the pull side of the door for a wheelchair user to be able to exit the door;

ss. When exiting the second door out of the restroom there is not 18 inches of latch side clearance on the pull side of the door for a wheelchair user to be able to exit the door;

[62]

## MEN'S RESTROOM NEAR THE HIGH LIMITS AREA

    **tt.**   Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment nearest the restroom entrance:

        **i.** The toilet compartment door fails to have door pulls located on both sides;

        **ii.** The toilet compartment door fails to be self-closing;

        **iii.** The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

        **iv.** The rear wall grab bar fails to be properly located properly on the rear wall;

        **v.** The side wall grab bar fails to be properly located properly on the rear wall;

[63]

vi. The toilet compartment door fails to be located a maximum of 4 inches from the side wall or the partition furthest from the water closet;

vii. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

uu. Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment furthest from the restroom entrance:

i. The toilet compartment door fails to have door pulls located on both sides;

ii. The toilet compartment door fails to be self-closing;

iii. The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

iv. The rear wall grab bar fails to be properly located properly on the rear wall;

v. The side wall grab bar fails to be properly located properly on the rear wall;

vi. he toilet compartment door fails to be located a maximum of 4 inches from the side wall or the partition furthest from the water closet;

vii. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

vv. When exiting the restroom, the accessible route fails to provide the required clear floor space at the turn;

ww. When exiting the restroom, the accessible route fails to provide the required passing space;

xx.  Imperial Palace provides urinals for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment furthest from the restroom entrance:

i.  The rim of the urinal exceeds the maximum required height of 17 inches above the finished floor;

ii.  Imperial Palace provides a urinal for able bodied individuals, but fails to provide at least 1 ADA accessible urinal with the required 36 inches of clear floor or ground space;

iii.  The urinal is confined on all or part of three sides and therefore the width fails to meet the required 36 inches;

yy.  Imperial Palace provides a lavatory for able-bodied individuals, but fails to provide an ADA accessible lavatory for

[66]

non-able-bodied individuals which includes but is not limited to the following elements:

    i. The top counter surface of the lavatory counter exceeds the maximum allowed height of 34 inches above the finished floor;

    ii. The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

    iii. There is insufficient knee and toe clearance under the lavatory sinks;

## MEN'S RESTROOM ON SECOND LEVEL NEAR HIGH TIDE CAFÉ

zz.   Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment nearest the restroom entrance:

[67]

i. The purported accessible toilet compartment fails to be arranged for a left or right hand approach;

ii. The toilet compartment door opening is located on the side partition and fails to be located a maximum of 4 inches from the front partition;

iii. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

iv. The toilet compartment fails to be a minimum of 60 inches wide which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the compartment;

v. The toilet compartment door fails to have door pulls located on both sides;

vi. The toilet compartment door fails to be self-closing;

vii. The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

        **viii.** The rear wall grab bar fails to be properly located properly on the rear wall;

**aaa.** Imperial Palace provides a lavatory for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals which includes but is not limited to the following elements:

        **i.** The top counter surface of the lavatory counter exceeds the maximum allowed height of 34 inches above the finished floor;

        **ii.** The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

        **iii.** There is insufficient knee and toe clearance under the lavatory sinks;

## MEN'S RESTROOM ON SECOND LEVEL NEAR TEIN

**bbb.** Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that

is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment nearest the restroom entrance:

    i. The purported accessible toilet compartment fails to be arranged for a left or right hand approach;

    ii. The toilet compartment door fails to be located a maximum of 4 inches from the side wall or the partition furthest from the water closet;

    iii. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

    iv. The toilet compartment fails to be a minimum of 60 inches wide which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the compartment;

    v. The toilet compartment door fails to have door pulls located on both sides;

    vi. The toilet compartment door fails to be self-closing;

[70]

    **vii.** The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

    **viii.** The toilet paper dispenser fails to be located 7-9 inches from the front of the water closet;

    **ix.** The rear wall grab bar fails to be properly located properly on the rear wall;

**ccc.** Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment furthest from the restroom entrance:

    **i.** The purported accessible toilet compartment fails to be arranged for a left or right hand approach;

ii. The toilet compartment door fails to be located a maximum of 4 inches from the side wall or the partition furthest from the water closet;

iii. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

iv. The toilet compartment door fails to have door pulls located on both sides;

v. The toilet compartment door fails to be self-closing;

vi. The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

vii. The toilet paper dispenser fails to be located 7-9 inches from the front of the water closet;

viii. The rear wall grab bar fails to be properly located properly on the rear wall;

ddd. Imperial Palace provides a lavatory for able-bodied individuals, but fails to provide an ADA accessible lavatory for

[72]

non-able-bodied individuals which includes but is not limited to the following elements:

    i. The top counter surface of the lavatory counter exceeds the maximum allowed height of 34 inches above the finished floor;

    ii. The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

    iii. There is insufficient knee and toe clearance under the lavatory sinks;

eee. When exiting the restroom, the accessible route fails to provide the required clear floor space at the turn;

fff. When exiting the restroom, the accessible route fails to provide the required passing space;

## MEN'S RESTROOM NEAR THE POOL AREA

ggg. Imperial Palace provides toilet compartments for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that

[73]

is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment nearest the restroom entrance:

    i. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

    ii. The toilet compartment fails to be a minimum of 60 inches wide which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the compartment;

    iii. The toilet compartment door fails to be self-closing;

    iv. The toilet paper dispenser fails to be located 7-9 inches from the front of the water closet;

**hhh.** When exiting the restroom there is not 18 inches of latch side clear floor space which prohibits individuals with disabilities from being afforded the opportunity to exit the restroom;

**iii.** When exiting the restroom, the accessible route fails to provide the required clear floor space at the turn;

[74]

**jjj.** When exiting the restroom, the accessible route fails to provide the required passing space;

**kkk.** Imperial Palace provides a lavatory for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals which includes but is not limited to the following elements:

> **i.** The top counter surface of the lavatory counter exceeds the maximum allowed height of 34 inches above the finished floor;
>
> **ii.** The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;
>
> **iii.** There is insufficient knee and toe clearance under the lavatory sinks;
>
> **iv.** The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

## MEN'S RESTROOM NEAR THE PARKING GARAGE

**lll.** Imperial Palace provides a toilet compartment for able-bodied individuals but fails to afford non-able-bodied individuals the

same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following elements in the toilet compartment:

    i. The centerline of the water closet exceeds the maximum allowed distance of 16-18 inches from the side wall;

    ii. The toilet compartment fails to be a minimum of 60 inches wide which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the compartment;

    iii. The toilet compartment door fails to be self-closing;

    iv. The toilet paper dispenser fails to be located 7-9 inches from the front of the water closet;

    v. The toilet paper dispenser and the toilet seat cover dispenser fail to be located at least 12 inches above the top gripping surface of the side wall grab bar;

vi. The rear wall grab bar fails to be properly located on the rear wall;

mmm. When exiting the restroom there is not 18 inches of latch side clear floor space which prohibits individuals with disabilities from being afforded the opportunity to exit the restroom;

nnn. When exiting the restroom, the accessible route fails to provide the required clear floor space at the turn;

ooo. When exiting the restroom, the accessible route fails to provide the required passing space;

ppp. Imperial Palace provides a lavatory for able-bodied individuals, but fails to provide an ADA accessible lavatory for non-able-bodied individuals which includes but is not limited to the following elements:

i. The top counter surface of the lavatory counter exceeds the maximum allowed height of 34 inches above the finished floor;

ii. The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

    **iii.** There is insufficient knee and toe clearance under the lavatory sinks;

    **iv.** The bottom reflecting surface of the mirror exceeds 40 inches above the finished floor;

**29.** To date, the barriers to access and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

**30.** Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. §12205.

**31.** Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiffs' injunctive relief, including an Order to alter the discriminating facility to make it readily accessible to, and useable by, individuals with disabilities to the extent required by the ADA, and closing the facility until the requisite modifications are completed, and to further order the Defendants to modify their policies, practices, and procedures, to make reasonable accommodations to individuals with disabilities.

# COUNT TWO
# VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(ii)
### *(Practices, procedures, and policies denying equal benefits)*

### ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers

32. Plaintiffs re-allege paragraphs 1-31 above.

33. The ADA, Title III, provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added).

34. The ADA, Title III, specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A))(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). In other words, the disabled must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons

[79]

who use wheelchairs and mobility aids have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs and mobility aids historically have been provided "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." <u>See</u> 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

35. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

36. To address this broad range of discrimination in the context of public accommodations, Congress enacted ADA, Title III, which provides in part: "No individual shall be discriminated against on

[80]

the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

37. By its clear text, ADA, Title III requires a public accommodation to provide individuals with disabilities *more than simple physical access*. Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with ADA, Title III. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title

prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

38. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit explained this clear statutory mandate in *Rendon v. Valleycrest Prod., Ltd.* 294 F.3d 1279, (11th Cir. 2002):

> "*A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both tangible barriers (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and intangible barriers (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges.*"

## **Defendants' Failed Practices and Lack of Policies Are Discriminatory**

39. Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii) discrimination includes:

> "*a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.*"

40. Accordingly, a place of public accommodation must modify a policy or practice that has the consequence of, or tends to deny, access to goods or services to the disabled.

41. As detailed below, Defendants have failed to make reasonable modifications in their policies, practices, and procedures that are necessary to afford their goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, Defendants denied services, segregated or otherwise treated Plaintiffs differently than other individuals who are not disabled. Pursuant

[83]

to 42 U.S.C. § 12182(b)(2)(A), Defendants have discriminated against Plaintiffs. Defendants will continue that discrimination forever until enjoined as Plaintiffs request. The discrimination is described more particularly in the following paragraphs.

42. Defendants either have no policies, practices, and procedures to remove architectural barriers or else they do not abide by them. The rampant architectural barriers previously identified in Count One establish that Defendants have failed to create, adopt, and/or implement ADA Title III compliance policies, procedures, and practices as to architectural barriers.

43. Defendants' use of its facilities, and its practices at the facilities, literally creates barriers and in so doing denies the Plaintiffs the full and equal enjoyment of the facilities. Those practices include:

   a) Defendants make counters inaccessible for use by the handicapped by the placement of merchandise upon them;

   b) Point of sales machines are located so as to be inaccessible;

   c) Defendants block maneuvering clearance and clear floor space in aisles in the gift shop by placing merchandise throughout them;

[84]

d) Defendants fail to provide accessible restrooms to Plaintiffs throughout the entire facility;

e) Defendants fail to provide an accessible pool area;

f) Defendants fail to provide a place for the disabled both to sit and sit and eat like able-bodied people can;

g) Defendants fail to provide accessible casino games with the required clear floor or ground space to the disabled;

h) Defendants fail to provide accessible cashier counters to the disabled;

i) Defendants fail to provide an accessible snack bar counter at Infusion which prohibits the disabled from being able to order and pick up food and drinks;

j) Defendants fail to provide an accessible arcade area to disabled individuals;

k) Defendants fail to provide an accessible bar and accessible seating for disabled individuals in the Chill Lounge;

l) Defendants fail to provide an accessible fitness center to disabled individuals;

m) Defendants fail to provide an accessible service counter for

disabled individuals in the first-class spa;

n) Defendants failed to provide hotel suites to disabled individuals;

o) Defendants failed to provide hotel deluxe rooms with an ocean view to disabled individuals;

p) Defendants failed to provide an accessible virtual tour of its resort to disabled individuals;

q) Defendants failed to provide an accessible reservation system for disabled individuals;

r) Defendants failed to provide an accessible phone reservation system to disabled individuals;

s) Defendants failed to provide a description of the accessible features of the resort for disabled individuals;

t) Defendants failed to provide a description of the accessible features of the resort guest rooms for disabled individuals;

u) Defendants failed to provide a policy to guarantee rooms that disabled individuals reserve.

44. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no

policies, practices, or procedures, or else they have failed to implement them, to ensure that any removal of architectural barriers is permanent. 42 U.S.C. § 12182(b)(2)(a)(iv) and (v).

45. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants' existing, practice is both in effect and/or explicitly to remediate ADA Title III architectural barriers only upon demand by the disabled.

46. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no policies, practices, and procedures or else they failed to create, implement and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at their casino, resort and spa as individuals without disabilities, 42 U.S.C. 12182(b)(1)(A), and in particular the opportunity to have full and equal access to all of the goods, services, privileges, advantages, or accommodations of IP.

47. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have failed to create, implement, and maintain a policy of complying with

ADA building design standards and regulations.

48. To date, the Defendants' discriminating policies, practices, and/or procedures have not been reasonably modified to afford goods, services, facilities, privileges, advantages, or other accommodations to individuals with disabilities.

49. A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, and accommodations. The Plaintiffs hereby demand that Defendants both create and adopt a corporate practice and policy that Defendants (1) will fully comply with Title III, ADA, and all its implementing regulations so that physical and non-physical barriers identified above are permanently removed from Defendants' casino, resort and spa consistent with the ADA; (2) Defendants will provide the disabled, including those with mobility limitations full and equal use and enjoyment of IP Casino Resort & Spa; (3) IP will remedy its practice of making ADA Title III remediations only upon demand by the disabled (4) IP will remedy its practice of screening out disabled individuals through

[88]

the use of Defendants reservation system; (5) IP will remedy its practice of screening out disabled individuals through the use of Defendants phone reservation system; (6) IP will remedy its practice of not guaranteeing Plaintiffs and others similar situated the accessible room they requested;

50. As pled above, Boyd Biloxi, LLC, "owns" the real property in which IP Casino Resort & Spa is located and "operates" the Resort Casino Spa, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

51. As pled above Boyd Gaming Corporation., "owns" and "operates" the IP Casino Resort & Spa online website, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

52. The ADA is over twenty-five (25) years old. Defendants know they must comply with the ADA Title III. The ADA Title III requires modifications in policies, practices, and procedures to comply with it, as pled above in the statute. 42 U.S.C. §12182(b)(2)(A)(ii).

[89]

53. By this Complaint, Plaintiffs provide sufficient notice of their demands for an alteration in Defendants' policies, practices, and procedures.

54. Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

55. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal policies, practices, and procedures.

### COUNT THREE
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
*Denial of Full and Equal Enjoyment*

56. Plaintiffs re-allege paragraphs 1-55 above.

57. 42 U.S.C. § 12182(a) provides:

> *"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."*

58. Congress enacted the ADA upon finding, among other things, that

"society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

59. Congress also found that: *"individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities,* 42 U.S.C. § 12101(a)(5); *"the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;"* 42 U.S.C. § 12101(a)(7). Congress even found that: *"the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."* 42 U.S.C. §

[91]

12101(a)(8).

60. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

61. The ADA provides, inter alia, that it is discriminatory to subject an individual or class of individuals on the basis of a disability "to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

62. The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability ... with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

63. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). Defendants' acts and omissions alleged herein are in violation of the ADA, 42 U.S.C. §§ 12101, et seq., and the regulations promulgated thereunder.

64. To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination*" including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities.*

[93]

42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

65. For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' *full and equal enjoyment* of the privileges and *services* offered by the public accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(1)(A)(i).

66. The keystone for this analysis is Defendants *must start by considering how its facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. Spector v.*

[94]

*Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128–29, 125 S.Ct. 2169, 162 L . E d . 2d 97 (2005) See also, *Baughman v. Walt Disney World Company*, 685 F.3D 1131, 1135 (9th Cir. 2012).

67. Plaintiffs Patrick Dunn and Hope Elly were denied full and equal access to the IP Casino Resort & Spa. Plaintiffs specifically and definitely want to return to the Defendants' casino, resort and spa to enjoy the elite award winning entertainment resort, which towers 32 stories over the scenic Back Bay of Biloxi and features elegant hotel rooms and suites with full amenities, a vast array of live entertainment options, an unforgettable gaming experience in the 70,000 square foot casino, great restaurants, and a first class spa. More specifically, Plaintiffs want to be afforded the same level of service that is offered to non-disabled individuals and which Defendants have failed to provide to Plaintiffs as follows: Defendants failed to provide accessible parking lots for disabled individuals; Defendants failed to provide accessible routes for disabled individuals; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when eating and ordering food in the restaurants at IP; Defendants failed to

provide Plaintiffs that same experience that non-disabled individuals have when eating and ordering food at the Infusion snack bar at IP; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the restrooms throughout the facility; Defendants failed to provide access to counters, point-of-sale machines, seating areas, accessible dining tables, all of which the non-disabled use freely at will; Defendants failed to provide the disabled seating and access to the bar in the Chill Lounge; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when playing games in the casino by failing to provide the required clear floor or ground space; Defendants failed to provide enough room to move through aisles to shop; Defendants failed to provide floor space to go to the bathroom; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when at the pool area; Defendants failed to provide Plaintiffs that same online experience non-disabled individuals have which includes making reservations on the online website; Defendants failed to provide Plaintiffs the same experience that non-disabled individuals have

[96]

of an "accessible virtual tour" of its resort; Defendants failed to provide accessible suites including but not limited to ocean view rooms, and all of the suites; Defendants failed to provide Plaintiffs the same experience of making reservations through the phone system; Defendants failed to maintain the accessible features of IP that are required to be readily accessible to and usable by Plaintiffs and others similarly situated, such as maintaining the parking lots and restrooms; and all the foregoing failures by Defendants inhibited Plaintiffs from having the same experience that non-disabled individuals have when at the IP Casino Resort & Spa.

68. In its Preamble to the title III regulation, the Department of Justice recognized that mobility impaired persons including persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

69. The ADA specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A)) (ii)-(iii); 28 C.F.R. § 36.202(b)-(c). Further, 28 C.F.R. § 302(b) require that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided "inferior seating" and "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." See 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

70. Thus, Defendants' "use" of the accessible features constitutes statutory discrimination in violation of the ADA, because Defendants have segregated and separated the disabled from the

[98]

non- disabled individuals. "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *H.R. Rep. No. 101-485(III), at 50, 1990 U.S.C.C.A.N at 473.* The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate those individuals into the economic and social mainstream American life. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct.1879, 149 L.Ed.2d 904 (2001) (*quoting H.R.Rep. No. 101-485, pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332*).

71. Defendants discriminated against Plaintiffs by denying Plaintiffs "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the facility during each visit. Each incident of deterrence denied Plaintiffs an equal "opportunity to participate in or benefit from the goods, services, facility, privilege, advantage, or accommodations" of IP.

72. Defendants' conduct and Defendants' unequal treatment to Plaintiffs constitutes continuous violations of the ADA and absent a Court ordered injunction from doing so, Defendants will continue to treat Plaintiffs and others similarly situated unequally.

73. Defendants' failure to maintain the accessible features that are required to be readily accessible to and usable by individuals with disabilities constitute continuous discrimination and absent a Court ordered injunction, Defendants will continue to not maintain the required accessible features at Defendants' facility. 28 C.F.R.§ 36.211(a).

74. Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

75. Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal acts of Defendants.

## COUNT FOUR
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12182(a) and 28 C.F.R. § 36.302 (e)(1)(i)-(ii)
*(Failure of website to show accessible features of the IP Casino, Resort, & Spa)*

76. Plaintiffs re-allege paragraphs 1-75 above.

77. The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with

disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., \*1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *Id. at 50, 1990 U.S.C.C.A.N. at 473.*

78. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5).

79. However, the Internet of today did not exist when Congress originally enacted the ADA and, accordingly, neither the ADA nor the regulations the Department of Justice promulgated under the ADA specifically addresses access to Web sites. *But the statute's broad and expansive nondiscrimination mandate reaches goods and*

[101]

*services provided by covered entities on Web sites over the Internet."* 75 Fed Reg. 43,460, 46,463 See also *Netflix,* 869 F. Supp. 2d at 200 (*excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public."* Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 20 (1st Cir. 1994)).

80. Congress expressly stated when enacting the ADA that: "*...the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times*". In light of this, the United States Department of Justice issued an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations. 75 Fed Reg. 43460. The Department of Justice explained in the ANPRM that although the Department has been clear that the ADA applies to websites of public accommodations, inconsistent court decisions, differing

[102]

standards for determining web accessibility, and repeated calls for Department action warranted further guidance. *Id.* at 43464. Through the ANPRM, the Department sought to explore what regulatory provisions they could propose *to make clear to entities covered by the ADA of their obligations to make their websites accessible.*

81. To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

82. By its clear text, Title III requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination"* including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other*

*opportunities.* 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

83.   For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182, 28 C.F.R. 36.302(e)(1)(i) and (ii). Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held persuasively in *Rendon v. Valleycrest Prod., Ltd.* 294 F.3d 1279, (11th Cir. 2002) that:

" *A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both <u>tangible barriers</u> (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and <u>intangible barriers</u> (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges.*"

84. The IP online website served to segregate and isolate Plaintiffs in that they were unable to determine any of the accessible features of the IP Casino Resort & Spa which includes but is not limited to: Defendants failing to identify and describe the accessible features of (1) the Casino, (2) the Resorts common areas its associated amenities; (3) Back Bay Buffet; (4) Thirty-two; (5) Tien (6) Costa Cucina; (7) Highlights Sports Lounge (8) High Tide Café (9) Quench (10) Infusion Bar; (11) Studio A; (12) Chill Ultra Lounge (13) the arcade; (14) the spa; (15) Essentials (16) Trends; and (17) the accessible features of the guest rooms themselves, much less provide them options for accessible features. Moreover,

Defendants provide a virtual tour of its Casino Resort & Spa to able-bodied individuals, but fail to make a virtual tour available of the accessible features of the Imperial Palace to disabled individuals.

85. The Department of Justice has promulgated regulations that specifically prohibit Defendants' conduct in this case as to the Defendants' places of lodging. 28 C.F.R. 36.302(e) specifically provides:

> "(1)*Reservations made by places of lodging. A public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party –*
>
> > (i) *Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms;*
> >
> > (ii) *Identify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs;"*
> > (emphasis added).

86. Defendants website and reservation system did not allow Plaintiffs to use the system in the same manner as individuals without disabilities, because (1) the website failed to show or otherwise inform of the accessibility features at the hotel and (2) it did not offer the same type of guest rooms to the disabled as to individuals without disabilities. Specifically, through the reservation system Defendants only offer the disabled hotel rooms that are allegedly accessible that are standard guests rooms, without any of the choices for upgraded amenities that are offered in the non-accessible rooms. The choices for upgraded amenities include but are not limited to the floor level, rooms that are adjoining rooms, the different types of suites and rooms, the view of the ocean, room size, the type of amenities offered in the room.

87. The reservation system did not allow Plaintiffs to make reservations in the same manner as the non-disabled because it failed to provide accessible opportunities to make reservations for either (1) a Deluxe King bed smoking room; (2) a Deluxe King bed non-smoking room; (3) a deluxe two queen bed smoking room; or (4) a deluxe two queen bed nonsmoking room. The Defendants

reservation system did not offer Plaintiffs any of the other types of rooms that Imperial Palace offers such as (1) a Deluxe King bed smoking room with a view; (2) a Deluxe King bed non-smoking room with a view; (3) a deluxe two queen bed smoking room with a view; or (4) a deluxe two queen bed nonsmoking room with a view; (5) the luxury suite; (6) the spa suite; (7) the Penthouse room; (8) the Junior penthouse suite; (9) the penthouse suite.

88. To date, the Defendant's discriminating actions continue.

89. As pled above, Boyd Biloxi, LLC, "owns" the real property and its improvements at 850 Bayview Avenue, Biloxi, Mississippi, 39530. 42 U.S.C. § 12182, and "operates" the establishment located at 850 Bayview Avenue, Biloxi, Mississippi, 39530., more commonly known has IP Casino Resort & Spa. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web based services, as alleged above.

90. As pled above, Boyd Gaming Corporation "owns" the public internet website ipbiloxi.com and "operates" the world wide

websites services that are available to the public at IP Casino, Resort & Spa. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web based services, as alleged above. 42 U.S.C. § 12182.

91. Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

92. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendant.

### COUNT FIVE
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12182(b)(2)(A)(i)
*(Use of technology that tends to screen out individuals with disabilities)*

93. Plaintiffs re-allege paragraphs 1-92 above.

94. The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with

disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., \*1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *Id. at 50, 1990 U.S.C.C.A.N. at 473.*

95.   Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5).

96.   However, the Internet today did not exist when Congress originally enacted the ADA and, accordingly, neither the ADA nor the regulations the Department of Justice promulgated under the ADA specifically addresses access to Web sites. *But the statute's broad and expansive nondiscrimination mandate reaches goods and*

services provided by covered entities on Web sites over the Internet." 75

Fed Reg. 43,460, 46,463 See also *Netflix*, 869 F. Supp. 2d at 200

*(excluding web-based services would "run afoul of the purposes of the ADA*

*and would severely frustrate Congress's intent that individuals with*

*disabilities fully enjoy the goods, services, privileges, and advantages*

*available indiscriminately to other members of the general public."*

*Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association*

*of New England, Inc.*, 37 F.3d 12, 20 (1st Cir. 1994)).

97. Congress expressly stated when enacting the ADA that: "...*the*

*types of accommodation and services provided to individuals with*

*disabilities, under all of the titles of this bill, should keep pace with the*

*rapidly changing technology of the times*". In light of this, the United

States Department of Justice issued an Advanced Notice of

Proposed Rulemaking ("ANPRM") on Accessibility of Web

Information and Services of State and Local Government Entities

and Public Accommodations.    75 Fed Reg. 43460.    The

Department of Justice explained in the ANPRM that although the

Department has been clear that the ADA applies to websites of

public accommodations, inconsistent court decisions, differing

standards for determining web accessibility, and repeated calls for Department action warranted further guidance. *Id.* at 43464. Through the ANPRM, the Department sought to explore what regulatory provisions they could propose *to make clear to entities covered by the ADA of their obligations to make their websites accessible.*

98. To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

99. By its clear text, Title III requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination*" including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other*

*opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

100. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in *Rendon v. Valleycrest Prod., Ltd.* 294 F.3d 1279, (11th Cir. 2002) that:

" *A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both* <u>tangible barriers</u> *(emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and* <u>intangible barriers</u> *(emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges.* "

**101.** Pursuant to 42 U.S.C. § 12182(b)(2)(A)(i) discrimination includes:

*The imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered.*

**102.** Pursuant to 42 U.S.C. § 12182(b)(2)(A)(iii) discrimination includes:

*A failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless*

*the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.*

103. The plain language of these statutory provisions applies to discrimination in offering the goods and services "of" a place of public accommodation or the services, programs, and activities "of" a public entity, rather than being limited to those goods and services provided "at" or "in" a place of public accommodation or facility of a public entity.

104. A place of public accommodation also may not refuse to make reasonable modifications to a policy or practice that has the consequence of denying such individuals access to its services. Nor can a public accommodation refuse to make modifications to a policy or practice that tends to deny individuals with disabilities access to the goods and services of the public accommodation.

105. Defendants utilize the Imperial Palace Casino Resort & Spa online website and reservation system to screen out disabled individuals, so that they are not informed of the accessibility features at the

hotel as well as not offered the same type of guest rooms as other individuals without disabilities. The screening out process specifically involves only offering hotel rooms that are allegedly accessible that are standard guests rooms without any upgraded amenities that are offered in the non-accessible rooms. The upgraded amenities include but are not limited to the floor level, rooms that are adjoining rooms, the different types of suites and rooms, the view of the ocean, room size, the type of amenities offered in the room, and among many other features non-disabled guests are offered, including the floor level and suites.

106. The IP online website served to screen Plaintiffs in that they were unable to determine any of the accessible features of the IP Casino Resort & Spa which includes but is not limited to: Defendants failing to identify and describe the accessible features of (1) the Casino, (2) the Resorts common areas its associated amenities; (3) Back Bay Buffet; (4) Thirty-two; (5) Tien (6) Costa Cucina; (7) Highlights Sports Lounge (8) High Tide Café (9) Quench (10) Infusion Bar; (11) Studio A; (12) Chill Ultra Lounge (13) the arcade; (14) the spa; (15) Essentials (16) Trends; and (17) the

accessible features of the guest rooms themselves, much less provide them options for accessible features. Moreover, Defendant's provide a virtual tour of its Casino Resort & Spa to able-bodied individuals, but fail to make a virtual tour available of the accessible features of the Imperial Palace to disabled individuals.

107. The reservation system served to screen Plaintiffs and only allowed them to make reservations for either (1) a Deluxe King bed smoking room; (2) a Deluxe King bed non-smoking room; (3) a deluxe two queen bed smoking room; or (4) a deluxe two queen bed nonsmoking room. The Defendants reservation system did not offer Plaintiffs any of the other types of rooms that Imperial Palace offers such as (1) a Deluxe King bed smoking room with a view; (2) a Deluxe King bed non-smoking room with a view; (3) a deluxe two queen bed smoking room with a view; or (4) a deluxe two queen bed nonsmoking room with a view; (5) the luxury suite; (6) the spa suite; (7) the Penthouse room; (8) the Junior penthouse suite; (9) the penthouse suite.

108. Moreover, Defendant's online website, its reservation system, and further exemplified by its employee's through the telephone and at the check in counter, screened out Plaintiffs by failing to ensure that accessible guest rooms are held for Plaintiffs and further, failing to make reasonable modifications in its policies, practices, or procedures, so that Plaintiffs are not excluded, denied services, segregated or otherwise treated differently than other individuals without disabilities.

109. The ADA and the title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services. A commercial transaction between a customer and a public accommodation requires communication between the two, and in this action, Defendants have chosen to use an online reservation system as well as a phone reservation system by which it communicates with able-bodied individuals to complete commercial transactions. Whereas, Defendants have chosen to use its reservation system and online website as a means by which to not communicate and transact

[118]

business with disabled individuals which is contrary to the broad mandate of the ADA which prohibits not only outright exclusion but also unnecessary differential treatment. See 42 U.S.C. §§ 12182(a), (b)(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "...*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]*" and that technological advances "*may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities.*" See H.R. Rep. No. 485, pt. 2, at 108 (1990).

110. These are precisely the sorts of claims Title III was intended to cover. The process for selecting an ADA accessible hotel room is no different than the implementation of eligibility criteria in other contexts that are clearly covered by the Act. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. See Section 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if Defendant

screened guests as they entered the Hotel Lobby, sending home guests on the grounds that they were deaf or physically disabled or suffered from diabetes or any other disability. See 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("*It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater.*"). That disabled individuals are screened out by an automated hotel reservation system, rather than by an admission policy administered at the studio door is of no consequence under the statute.

111. Defendants' failure to modify this practice necessary to ensure Plaintiffs the full and equal enjoyment of the IP Casino Resort & Spa, has resulted in the complete exclusion from making reservations online and over the phone in the same manner as other individuals who do not have disabilities. See § 12182(b)(2)(A)(ii)-(iii).

112. The screening process violates the Americans with Disabilities Act by directly and intentionally screening out disabled individuals for

the purpose of preventing the disabled from being afforded the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations, at Imperial Palace. 42 U.S.C. § 12182(b)(2)(A)(i).

113. The screening of individuals with disabilities is not necessary to provide accommodations. because no accommodations are provided.

114. To date, the Defendant's discriminating actions continue.

115. As pled above, Boyd Biloxi, LLC, "owns" the real property and its improvements at 850 Bayview Avenue, Biloxi, Mississippi, 39530. 42 U.S.C. § 12182, and "operates" the establishment located at 850 Bayview Avenue, Biloxi, Mississippi, 39530., more commonly known has IP Casino Resort & Spa. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web based services, as alleged above.

116. As pled above, Boyd Gaming Corporation "owns" the public internet website ipbiloxi.com and "operates" the world wide

websites services that are available to the public at IP Casino, Resort & Spa. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web based services, as alleged above. 42 U.S.C. § 12182.

117. Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

118. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendant.

**WHEREFORE**, premises considered, Patrick Dunn and Hope Elly demand judgment against the Defendants on Counts One through Five and requests the following injunctive and declaratory relief:

1. That the Court declare that the property owned and business operated by the Defendants as well as all Defendants' illegal actions described herein violate the Americans with Disabilities Act, as more particularly described above;

2. That the Court enter an order enjoining the Defendants to alter the facility to make it accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and (v) and their implementing regulations, as stated in Count One;

3. That the Court enter an order, in accordance with Count Two, directing the Defendants to modify their policies, practices, and procedures both to remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin Defendants to make their business practices consistent with ADA Title III in the future;

[123]

4.   That the Court enter an order directing the Defendants to provide Plaintiffs full and equal access both to the IP Casino Resort & Spa experience and to the use of the IP Casino Resort & Spa facilities, and further order Defendants to maintain the required accessible features at the Defendants establishment so that Plaintiffs and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

5.   That the Court enter an Order directing the Defendants to evaluate and neutralize their policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow them to undertake and complete corrective procedures;

6.   That the Court enter an order enjoining Defendants from using the reservation system to screen and defer to another location individuals with disabilities, as stated in Count Four.

7.   That the Court enter an order enjoining compliance with federal regulations and statutes as to the adequacy of the reservation system for individuals with disabilities, as stated in Count Five.

8.   That the Court award reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to Plaintiffs; and

9.   That the Court award such other, further, and different relief as it

deems necessary, just, and proper.


Respectfully Submitted, this the $\underline{18^{th}}$ Day of November, 2016.


/s/ _____

**BRADLEY D. MCADORY**
**BPR # MS-10545**
The ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36116
334.819.4030 p
334.819.4032 f
BDM@ADA-Firm.com
*Attorney for the Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed with the Clerk of Court the aforementioned Complaint for service of process by USPS mail or electronic mail, postage prepaid and properly addressed this _18th_ day of November, 2016 to the following:


**BOYD BILOXI, LLC**
c/o Registered Agent
attn.: Kyra Monk
850 Bayview Avenue
Biloxi, MS 39530

**BOYD GAMING CORPORATION**
c/o Registered Agent
attn.: Toni Burns
1477 Casino Strip Blvd.
P.O. Box 220
Robinsville, MS 38664

/s/ _____
**BRADLEY D. MCADORY**
**BPR # MS-10545**
The ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36116
334.819.4030 p
334.819.4032 f
BDM@ADA-Firm.com
*Attorney for the Plaintiffs*

[126]